COMMONWEALTH *vs.* SHAWN T. COLLINS. No. 88-P-183. January 23, 1989. *Homicide. Evidence,* State of mind, Relevancy and materiality. *Practice, Criminal,* Instructions to jury. *Intoxication.*

The defendant has appealed from his conviction of the murder in the second degree of a fourteen week old boy. We affirm the conviction.

The jury could have found the following facts. The defendant, the live-in boyfriend of the infant's mother, was alone with the infant on the evening of August 26, 1985. The defendant told the police that he became "aggravated [and] pissed off [with the infant] cuz he wouldn't stop crying." The defendant "jerk[ed] the baby from [his] swing, striking the baby's head at the top bar . . . he [then] held the baby up in front of him and shook him and squeezed him . . .[for] a minute and a half to two minutes." The infant "went limp" as the defendant was shaking him. After shaking the infant, the defendant dropped him on the couch, where he "hit on the front edge and bounced off and landed face down on the floor." The cause of death, as determined by the pathologist, was a cerebral edema — swelling of the brain as a result of the shaking by the defendant.

The jury could also have found, based on extensive expert testimony, that the infant was a battered child with multiple injuries that had been inflicted upon him prior to the night of his death on August 26. These injuries included bruises on the forehead, spine, and buttocks, retinal hemorrhages in the eyes, abraded skin around the anus, fractures of both the left and right humerus, and a fracture of the left tibia. According to a physician, the fractures were neither of a nature which the infant could inflict upon himself, nor were they fractures capable of being caused accidentally or inadvertently. The fractures were not detected until an autopsy was per-

formed. According to expert testimony, the fractures of the humeri could have occurred "five minutes before death or . . . days before death." The leg fracture was no "more than two weeks of age . . . ." All the fractures were "characteristic manifestations" of shaken infant syndrome.

That syndrome, a form of the battered child syndrome, is a recognized medical diagnosis based on a pattern of characteristic injuries which are inflicted as the result of the violent shaking of an infant in a back and forth fashion creating a whiplash type effect. Typical injuries consistent with the syndrome include certain types of fractures, subdural brain injuries, and retinal hemorrhages.

Finally, the jury could have found that the defendant had taken the infant to a hospital on August 19, 1985, eight days before the incident that led to his death. On that occasion, the infant was diagnosed as having aspiration pneumonia. Additionally, during this hospitalization, facial bruises and a scratch were observed on the infant and a subconjunctival hemorrhage under the eye was detected.

1. The defendant objected to the admission of evidence that the infant had suffered a fractured leg sometime within the two weeks prior to his death. Because the fracture was not discovered until the autopsy was conducted, the defendant argues that he could not have known of it, and, therefore, that it was unfair to admit the evidence on the issue of his state of mind on August 26.

The defendant's argument misstates the purpose for which the evidence was admitted. Whether the defendant knew, or should have known, that the infant had in fact a broken leg was not essential to the admission of the evidence. There was sufficient evidence to show that the defendant had a custodial relationship to the infant during the period when the infant incurred the injuries that were discovered in the autopsy. There was also circumstantial evidence, not too remote in time, tending to link the defendant to prior abuse of the infant, particularly the indications of abuse observed in the infant's hospitalization on August 19. On this evidence, the jury were free to consider whether the prior injury "show[ed] that someone in a custodial relation to [the infant] bore him ill will," *Commonwealth* v. *Labbe*, 6 Mass. App. Ct. 73, 76 (1978), and cases cited, that is, that the defendant, acting with anger, resentment, or hostility, may have shaken or hit the infant prior to August 26, when the infant cried or aggravated him in some way. See *Commonwealth* v. *Greene*, 12 Mass. App. Ct. 982 (1981). See also *Commonwealth* v. *Little*, 376 Mass. 233, 238 (1978); *Commonwealth* v. *Gallison*, 383 Mass. 659, 666 (1981); *Commonwealth* v. *Bettencourt*, 20 Mass. App. Ct. 923, 925 (1985); Liacos, Massachusetts Evidence 418 (5th ed. 1981).

We briefly note two other points. First, the judge carefully instructed the jury that they were not to consider the evidence about the leg fracture in regard to the defendant's state of mind on August 26 unless they first found that the defendant had abused the infant in the past, specifically just

before the infant's hospitalization on August 19. (As the judge cautioned the jury at the conclusion of his thorough limiting instruction, "if you [the jury] cannot fairly connect it up to the defendant, then you can't consider it at all because it would be totally inadmissible"). We assume the jury followed the limiting instruction in arriving at their verdict. *Commonwealth* v. *Barbosa*, 399 Mass. 841, 849 (1987). Second, the evidence of the fractured leg was cumulative of a considerable amount of other very detailed and graphic medical evidence, which had not been objected to, describing injuries suffered by the infant prior to his death. In view of the additional medical evidence, it is difficult to see how the evidence of the leg fracture, even if improperly admitted, could have prejudiced the defendant. The defendant has shown nothing on this issue that merits a new trial.

2. The defendant's trial counsel made no objection to the instructions given by the judge on the issue of intoxication. The instructions advised the jury that (a) voluntary intoxication does not excuse the commission of a crime, and (b) they could consider evidence of the defendant's drinking in deciding whether he was able to make voluntary incriminating statements to the police. The evidence of intoxication was, at best, minimal, and insufficient to raise any question that the defendant's consumption of alcohol may have rendered him incapable of acting with the malice required for a conviction of second degree murder. See *Commonwealth* v. *Fano*, 400 Mass. 296, 307 (1987), and cases cited. Further, the issue of intoxication was not one that was actively pursued at trial. See *Commonwealth* v. *Gabbidon*, 398 Mass. 1, 5 (1986). Noting that the case was tried prior to the decision of the Supreme Judicial Court in *Commonwealth* v. *Grey*, 399 Mass. 469 (1987), we conclude that no substantial risk of a miscarriage of justice was created by the instructions on intoxication.

3. For the reasons discussed in *Commonwealth* v. *Kirkpatrick*, *ante* 595, 598 (1988), we conclude that the Commonwealth's evidence did not exceed the outline contained in the bill of particulars of its expected proof, at least not to a point that the defendant incurred any prejudice.

*Judgment affirmed.*

*Mary O'Sullivan Smith*, Assistant District Attorney, for the Commonwealth.

*Peter F. Staiti*, for the defendant, submitted a brief.