## COMMONWEALTH *vs.* VIVIAN WOTAN.[1]

No. 94-P-811.

Norfolk. September 27, 1994. - December 16, 1994.

Present: BROWN, KASS, & FINE, JJ.

Further appellate review granted, 419 Mass. 1110 (1995).

*Telephone. Evidence*, Prior misconduct, State of mind, Pattern of conduct, Relevancy and materiality. *Practice, Criminal*, Required finding. *Words*, "Repeatedly."

For purposes of G. L. c. 269, § 14A, the word "repeatedly" used therein means "more than once," so that two incidents of harassing telephone calls are sufficient to lay the basis for a conviction under that statute. [728-730]

At the trial of a complaint for violation of G. L. c. 269, § 14A, which was based on two specific telephone calls, evidence of a barrage of phone calls received by the victims over a four-year period that were identifiably made by the defendant was admissible as bearing on the defendant's motive and illuminated a pattern and course of conduct [731-732]; the judge also properly in his discretion, with appropriate instructions, admitted evidence of "thousands" of telephone calls by an unidentified person and other anonymous acts as probative of intent to harass, annoy or molest [732-734].

Evidence at the trial of a complaint for violation of G. L. c. 269, § 14A, was sufficient to warrant a finding of guilty. [734]

At a criminal trial the judge properly excluded a tangential line of inquiry by defense counsel where the issue in question, a witness's bias, had been amply examined. [734]

At a criminal trial, no error appeared in the judge's instructions to the jury. [735]

COMPLAINT received and sworn to in the Brookline Division of the District Court Department on December 15, 1992.

On transfer to the jury session of the Dedham Division, the case was tried before *Gerald Alch*, J.

*Kimberly Homan* for the defendant.

---

[1]A pseudonym.

*Robert C. Cosgrove*, Assistant District Attorney, for the Commonwealth.

KASS, J. From September 3, 1992, through September 21, 1992, Francine and Arnold Kegan[2] placed a trap on their home telephone in Brookline to trace annoying telephone calls that they had been receiving over a period of years. During that period, two "hang up" calls, in which the caller hangs up as soon as the ring is answered, were traced to the defendant, Vivian Wotan. Those calls were made on September 16, 1992, at 9:46 P.M. and on September 17, 1992, at 11:34 P.M. After trial in the District Court, Wotan was convicted of violating G. L. c. 269, § 14A, which makes it a misdemeanor to telephone someone repeatedly solely to harass, annoy or molest.[3] In her appeal, a principal ground for reversal argued by Wotan is that the jury were allowed to hear evidence about voluminous vexatious telephone calls to the Kegan household and were permitted to speculate that those calls were made by her. The defendant makes additional appellate points, among them that two calls do not satisfy the adverb "repeatedly" which appears in the statute. We affirm.

1. *How many calls satisfy the adverb "repeatedly"?* In *Commonwealth* v. *Kwiatkowski*, 418 Mass. 543, 548 (1994), the court decided that, for purposes of the "stalking statute," G. L. c. 265, § 43, as inserted by St. 1992, c. 31, the word "repeatedly" meant more than two incidents.[4] The court

---

[2]Pseudonyms.

[3]So far as material, G. L. c. 269, § 14A, as appearing in St. 1978, c. 379, § 3, provides: "Whoever telephones another person . . . repeatedly, for the sole purpose of harassing, annoying or molesting such person or his family, whether or not conversation ensues . . . shall be punished by a fine of not more than five hundred dollars or by imprisonment for not more than three months, or both." Wotan was sentenced to ninety days imprisonment in a house of correction, forty-five days to be served and the balance suspended, subject to probation conditions. Those conditions were that the defendant undergo treatment by a psychologist and that she make no contact of any kind with the Kegan family.

[4]*Commonwealth* v. *Kwiatkowski* was decided after the trial of this case; indeed, after the defendant's primary appellate brief was filed. The defendant argued the implications of the *Kwiatkowski* opinion in her reply brief. In restating the stalking statute in the *Kwiatkowski* case, the court ex-

reached that conclusion because subparagraph (*d*) of the stalking statute speaks of harassment as a "pattern of conduct" or "series of acts," phrases which themselves connote multiple acts and conduct. Inevitably, engaging *repeatedly* in multiple acts adds up to more than two incidents. In other contexts, the court observed, the word might mean just more than once. *Id.* at n.6. Making annoying telephone calls is a less serious crime than stalking,[5] and may require a lesser standard of repetition to prove it. By its nature, making annoying telephone calls is also an offense likely to be proved contextually, i.e., against the background of other conduct and other telephone calls. That is so because the statute requires that the offending calls be made for the "*sole* purpose of harassing, annoying or molesting" (emphasis supplied). Unless the caller were to make an announcement that he calls solely to harass, annoy, or molest, that singular purpose will have to be inferred from other conduct, including other telephone calls. As the sole purpose of two calls may be proved by other calls or other conduct, we decide that two incidents — all that have been charged in the complaint — are sufficient to lay the basis for conviction under G. L. c. 269, § 14A. In several analogous instances, courts have construed the adjective "repeated" or the adverb "repeatedly" to mean "more than once." See *Konrad* v. *State*, 763 P.2d 1369, 1379 (Alaska Ct. App. 1988) (repeated threats); *People ex rel. VanMeveren* v. *County Ct.*, 191 Colo. 201, 205 (1976) (use of " 'fighting words . . . repeatedly . . . with intent to harass, annoy or alarm"); *State* v. *Diede*, 319 N.W.2d 818, 821 (S.D. 1982) (use of a telephone with intent to disturb any person by repeated anonymous telephone calls). See also, as other examples of the interpretation of "repeated" or "repeatedly" meaning "more than once," *George Hyman Constr. Co.* v. *Occupational Safety &*

---

pressly eschewed the word "repeatedly" in its statement of the elements of the crime but did say that a pattern or series of events in the context of the statute would involve more than two incidents.

[5]Stalking is a felony, G. L. c. 265, § 43(*a*); making annoying telephone calls is a misdemeanor.

*Health Review Commn.*, 582 F.2d 834, 839 (4th Cir. 1987); *Todd Shipyards Corp.* v. *Secretary of Labor*, 586 F.2d 683, 686 (9th Cir. 1987). Contra *Bethlehem Steel Corp.* v. *Occupational Safety & Health Review Commn.*, 540 F.2d 157, 160 (3d Cir. 1976).

2. *Evidence of other calls and conduct to prove sole purpose to harass, annoy or molest.* Offending against G. L. c. 269, § 14A, requires a peculiar exclusivity of purpose: *solely* to harass, annoy or molest. *Commonwealth* v. *Voight*, 28 Mass. 769, 773 (1991). *Commonwealth* v. *Strahan*, 30 Mass. App. Ct. 947, 949 (1991). Calling eleven times in seven minutes, while perhaps evidence of a desire to harass, did not violate § 14A when that same evidence suggested an intent to rekindle a relationship. *Ibid.* In making its case against Wotan, the government introduced evidence of a love affair between Wotan and Kegan and, over defense objection, evidence of a barrage of telephone calls, said to number in the multi-thousands, endured by the Kegans over a four-year period. Some of those were calls in which Wotan identified herself; many were unidentified. It is to evidence of unidentified calls that the defense particularly objects, not least because the unidentified calls were of the most obviously harassing, annoying, and molesting character.

Wotan and Kegan first encountered one another in April, 1985, when Wotan was hired by the Bank of Boston as a secretary for Kegan who, at that time, was the bank's director of telecommunications. Some two and one-half years later, Kegan's operation was transferred to a different building, and he was assigned a new secretary. During this period, the relationship between the two had been correct and businesslike. Wotan had discharged her duties competently.

In April, 1988, i.e., after three years at the Bank of Boston, Wotan was let go. From that time, the accounts by Kegan and Wotan of what happened between them conflict markedly. There is agreement only that they had an affair from July, 1988, to September, 1988, during which there were at least three instances of sexual intercourse. Each claims to have been seduced by the other. Taking the evi-

dence in the light most favorable to the prosecution, the jury could have found that, after the third sexual encounter, Kegan, who was married and had children, decided "to put [his] life in order," by ending the affair and, indeed, all communication with Wotan.

To that cutoff, Wotan did not take kindly. She proceeded to call Kegan at home in the early morning, at his work, and at home again at night. When he answered the phone, Wotan would say something like, "[Arnold, Arnold] I want to talk to you" or "[Arnold], I love you." Sometimes these calls came seven or eight in a row. Wotan did not seem to "get [his] message" and Kegan would be provoked into slamming down the receiver when he heard her on the line. In addition to calls in which Wotan spoke, Kegan received calls at home and on his voice mail at work consisting of snatches of music, voices talking on records or tapes, and "rude noises." There were also occasional hang up calls.

In July, 1989, calls from Wotan took on an ominous tone: "You better listen to me" or "You must speak to me." Kegan agreed to meet. On the advice of his wife, to whom he had revealed all, Kegan took along his then current secretary as a buffer. As soon as Wotan saw Kegan's escort at the place of meeting, she fled. Between August, 1989, and August, 1992, the month before the Kegans placed the trap on their telephone, Kegan received approximately five calls per day at work and five per day at his home. Beginning with 1991, the caller was generally unidentified and hung up as soon as the phone was answered. There were exceptions. During an eight-day period in 1992, while Kegan was in a hospital bed, recovering from a lacerated leg, he received from eight to twenty calls from Wotan, most of them introduced by "I love you" or "I want to talk to you."

Evidence of prior telephone calls which, by their sheer number, would be seen as annoying raises the question whether that evidence was improperly received because it involved prior misconduct of the defendant, tending to prove a propensity to commit the crime charged or the probability that the accused committed the offense. It is familiar ground

that evidence of that kind and for that purpose is inadmissible. *Commonwealth* v. *Chalifoux*, 362 Mass. 811, 815-816 (1973). *Commonwealth* v. *Trapp*, 396 Mass. 202, 206 (1985). *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986). *Commonwealth* v. *Sapoznik*, 28 Mass. App. Ct. 236, 243 (1990). Prior misconduct evidence may be received, however, if it bears on the defendant's state of mind while committing the crime charged, *Commonwealth* v. *Gallison*, 383 Mass. 659, 672 (1981), *Commonwealth* v. *Azar*, 32 Mass. App. Ct. 290, 299-300 (1992), or if it illuminates a common scheme, pattern, or course of conduct by the defendant. *Commonwealth* v. *King*, 387 Mass. 464, 472 (1982). *Commonwealth* v. *Barrett*, 418 Mass. 788, 793-794 (1994). *Commonwealth* v. *Odell*, 34 Mass. App. Ct. 100, 103 (1993).

The history of the calls which the Kegans had received from Wotan had a bearing on her purpose in making them and illuminated a pattern and course of conduct. A spate of telephone calls, although irritating to the receiver, may indicate no more than an urgent purpose to receive a response from an object of affection, a vendor, a taxi-dispatcher, or city hall. *Commonwealth* v. *Strahan*, 30 Mass. App. Ct. at 949. A drumfire of calls — morning, noon, and night for days, weeks, and months — is so obviously vexatious to the receiver that the requisite sole purpose of harassing, annoying, and molesting may be inferred, even if getting the receiver's goat is at bottom stimulated by an obsessive desire to get the receiver's attention. To the extent, therefore, that telephone calls were identifiably Wotan's, they were admissible to shed light on the caller's sole purpose.

Somewhat more difficulty attends the receipt of evidence of thousands (so the Kegans claimed) of calls by an unidentified caller and of odd mail, unordered pizzas, and taxicabs dispatched by an unidentified party. There have been cases in which the link to the defendant has been imperfect. So, for example, in *Huddleston* v. *United States*, 485 U.S. 681 (1988), the defendant was charged with selling stolen videotapes and evidence was received about his previous involve-

ment in selling stolen television sets. *Id.* at 683. The prosecution never established by clear and convincing evidence that the television sets (which Huddleston, the defendant, was selling for $28 each) had been stolen. In *Commonwealth* v. *Azar*, 32 Mass. App. Ct. at 298-299, evidence was received of previous injuries to the baby the defendant was charged with murdering. Only inference tied the defendant in that case to the previous injuries. The rationale for allowing admission, in the discretion of the trial judge, of what may more accurately be called "prior incidents" evidence, was that a jury, properly instructed about the limited purpose of the "prior conduct" evidence, could consider the prior incidents as bearing on intent or knowledge of the defendant. *Huddleston* v. *United States, supra* at 691-692. *Commonwealth* v. *Azar, supra* at 300. It is for the judge to weigh whether the probative value of the prior conduct outweighs its potential for unfair prejudice. *Huddleston* v. *United States, supra* at 691. *Commonwealth* v. *Azar, supra* at 300.

If in *United States* v. *Huddleston, supra,* and *Commonwealth* v. *Azar, supra,* the links between the prior conduct and the defendants were imperfect, the connection in the instant case between the anonymous telephone calls and a particular person is still more tenuous because anonymous telephone calls and acts (such as the mailings and deliveries) are, by their nature, not perceptibly linked to a particular individual. They are anonymous. Yet connections may be inferred through timing, mode of communication, content of the communication, similarity to identified conduct, and interpersonal relationships, particularly those involving grievances against the recipient of the unwanted communication. In the case at hand, we have: repetitive calls and contrived personal contact by Wotan; the overlapping of the anonymous calls with identified ones; the increase in anonymous calls as Kegan rejected Wotan more definitively; and the entire history of the Kegan-Wotan relationship. Although far from a compelled inference, the inference was allowable and, in fact, plausible, that the source of the anonymous communications was Wotan. The judge, in his discretion, could al-

low the jury to hear evidence of the anonymous calls as probative of intent to harass, annoy, or molest.

On six occasions, the trial judge took pains to instruct the jury that they were first to consider whether the anonymous calls were indeed made by the defendant, and that, if they so determined, they were to consider that evidence for the purpose of determining whether the sole purpose of the defendant in making the two hang up calls traced to her had been to harass, annoy or molest. The instructions did not, as the defendant suggests on appeal, give the jury carte blanche in how they considered the testimony about anonymous acts. At no point did the defense object to the cautionary instruction. See Mass.R.Crim.P. 24(b), 378 Mass. 895 (1979).

3. *Sufficiency of the evidence.* Although it is important to keep in mind what has previously been touched upon, that G. L. c. 269, § 14A, was not intended to turn into criminal conduct unwelcome telephone calls by parties to broken romances, failed business transactions, neighborhood quarrels, and family eruptions, see *Commonwealth* v. *Strahan,* 30 Mass. App. Ct. at 949; *State* v. *Patterson,* 534 S.W.2d 847, 850-851 (Mo. Ct. App. 1976), the evidence of repetitive calls at all hours, many of them producing only noise, allowed the jury to find that the two hang up calls which were the subject of the complaint were made solely to harass, annoy, or molest. The defendant was not entitled to a required finding of not guilty.

4. *Other issues.* (a) It was not error to exclude questions to Wotan by defense counsel that she had been informed of the telephone trap by the law firm defending the Bank of Boston in her unfair discharge action. The probative value of that information, the defense argues, is that it tended to show Kegan had a motive to testify damagingly against Wotan on behalf of his employer. There was ample opportunity — fully availed of — for the defense to examine Kegan as to his bias against Wotan. The judge acted within his discretion in limiting a tangential line of inquiry put to the defendant by her lawyer.

(b) We have reviewed the jury instructions and do not read in them the confusing quality which the defendant urges in her brief.

*Judgment affirmed.*