COMMONWEALTH *vs.* HENRY H. SULLIVAN.

Suffolk. November 4, 1981. — March 4, 1982.

Present: HENNESSEY, C.J., LIACOS, NOLAN, & LYNCH, JJ.

*Homicide. Practice, Criminal,* Plea. *Constitutional Law,* Plea.

On a motion for a new trial by a defendant claiming prejudicial constitu-
tional error in the acceptance of his plea of guilty of murder in the sec-
ond degree during his trial for murder in the first degree, a conclusion
by the motion judge that defense counsel's pretrial explanation of the
essential elements of first degree murder and lesser included offenses
had "become ineffective" by the time the defendant changed his plea
was not supported by findings either that defense counsel's attention at
trial had been focused on the possibility of a first degree murder con-
viction, to the exclusion of a manslaughter conviction, or that the de-
fendant was under emotional stress at the time he changed his plea,
where evidence showed that the defendant was of above average intel-
ligence and had competent counsel who explained fully the elements of
the crimes of which he might be convicted on the evidence. [501-503]
Evidence at the trial of an indictment for murder in the first degree war-
ranted a conclusion that the defendant, in pleading guilty to the offense
of murder in the second degree, adopted a description of his conduct
which established an attempt to harm the victim. [506-509]

INDICTMENT found and returned in the Superior Court on
July 8, 1971.

A motion for leave to withdraw a plea of guilty and for a
new trial, filed on May 22, 1980, was heard by *Brogna,* J.

After review was sought in the Appeals Court, the Su-
preme Judicial Court ordered direct appellate review on its
own initiative.

*James R. Brunette,* Assistant District Attorney (*Kevin
Connelly,* Assistant District Attorney, with him) for the
Commonwealth.

*William J. Leahy (Margaret H. Van Deusen* with him)
for the defendant.

LYNCH, J.  On July 8, 1971, the defendant, Henry H. Sullivan, was indicted for the murder in the first degree of Barbara Ann Bogdan.  He pleaded not guilty.  The case went to trial in the Superior Court in Suffolk County.  After two and one-half days of testimony, but before the Commonwealth rested its case, the defendant offered to plead guilty to so much of the indictment as charged murder in the second degree.  The trial judge, after a hearing, accepted the defendant's plea and, on January 19, 1972, sentenced the defendant to life imprisonment at the Massachusetts Correctional Institution at Walpole.

On May 22, 1980, the defendant filed, pro se, a motion for a new trial.  Counsel was appointed to represent the defendant on the motion.  After a hearing, a second judge of the Superior Court[1] (the motion judge) granted the defendant's motion for a new trial.  The Commonwealth appealed the grant of the defendant's motion to the Appeals Court.  Mass. R. Crim. P. 30 (c) (8), 378 Mass. 900 (1979). We transferred the case to this court on our own motion. We reverse and reinstate the original judgment of conviction.

1.  *The trial.*  Before the defendant offered to change his plea, the Commonwealth had introduced evidence tending to show the following.

On Saturday night, June 5, 1971, the defendant went to "Lucifer's," one of three bars in the Kenmore Club in Boston.  There he became acquainted with a man who later accompanied him to "Yesterday's," another bar in the Kenmore Club.  The defendant met the victim, Barbara Ann Bogdan, in Yesterday's.  (The victim's brother testified that the victim and the defendant knew one another and had dated on several occasions.)  The acquaintance and another witness testified that the defendant and the victim left Yes-

---

[1] The judge who presided at a defendant's trial normally should hear that defendant's motion for a new trial, if one is made.  See Mass. R. Crim. P. 30 (b), 378 Mass. 900 (1979); *Commonwealth* v. *Leventhal,* 364 Mass. 718, 722 (1974).  In this case, however, the trial judge had retired by the time the defendant filed his motion for a new trial, and another judge of the Superior Court was assigned to hear the motion.

terday's together shortly after midnight, announcing that they intended to return. The victim left her coat in the Kenmore Club's cloakroom. Four witnesses testified to having seen the defendant and the victim together in Yesterday's; two additional witnesses testified that the couple passed them as they were standing in the doorway to Yesterday's, and that the defendant and the victim walked away from Yesterday's toward Commonwealth Avenue. Several of the witnesses testified that the defendant was sober. The witnesses' identification of the defendant was perhaps facilitated by the defendant's dress that Saturday night: the witnesses testified that he was wearing a white suit.

Early in the morning of Sunday, June 6, a passing bicyclist discovered the victim's body seated on a park bench in the Esplanade, a narrow strip of park that lies between the Charles River and Storrow Drive within a few blocks of Yesterday's. The body and the bench were spattered with blood. Police officers discovered the victim's wig on the far side of a four-foot fence about eight feet away.

The medical examiner who first examined the body and later performed an autopsy testified that the victim had suffered three deep lacerations to the back of her skull, and that those lacerations were consistent with the victim's head having struck with great force one of the cement posts supporting the park bench. His examination revealed an abrasion on the victim's chin consistent with a blow from a fist, and other abrasions inflicted upon the victim's left eye, shoulders, back, chest, hands, left knee and ankle, all resulting from external force. The victim's neck showed evidence of fingernail marks, indicating that "[a] great deal of pressure" had been applied to the victim's neck. Death resulted from asphyxiation: one of the victim's nylon stockings had been removed, pieces of such a stocking were found clinging to the neck of the victim's dress and to the park bench, and the medical examiner concluded that the manner in which the victim had died was consistent with strangulation by a nylon stocking.

The defendant did not report for work at his job at a meat packing plant on Monday, the day after the victim's death.

When the defendant appeared for work on Tuesday, a co-worker testified that the defendant was "very quiet, not his normal self" and that he was "very serious-minded." On Wednesday, the defendant was again absent and, in response to another coworker's inquiry on Thursday regarding his absences, the defendant replied, "I got problems."

On Friday, June 11, 1971, police officers arrested the defendant at his parents' home in Milton, where he was living. Some time later, the defendant's father gave the authorities a statement which led police officers to discover a white suit which the defendant later stipulated was his. The suit was covered with bloodstains matching the victim's (but not the defendant's) blood type; the medical examiner testified that the victim's blood type is found in only eight to ten percent of the population.

After the Commonwealth had introduced the evidence summarized above (including the defendant's bloodstained suit and photographs of the victim taken at the scene and in the mortuary), the defendant, on the advice of counsel, offered to plead guilty to so much of the indictment as charged second degree murder.

The trial judge then examined the defendant under oath. The defendant admitted to unlawfully killing the victim. He insisted that he had been intoxicated at the time of the incident. He stated that he had accompanied the victim to the Esplanade, that he had been embracing the victim with her consent, "and that's where [he] lost control of [him]-self." The next thing that the defendant claimed to remember clearly was that the victim was dead; in response to further questions, however, he admitted remembering hitting the victim. The judge asked the defendant these questions: "Did you have any malice towards this young lady?" "Did you have any fight with her?" "Did you lose your head at all as a result of passion?" To each question, the defendant replied, "No." He also stated, "I don't believe I meant to do what I did."

The defendant acknowledged, however, that he understood that he had a right to a jury trial and that the jury

could find him either innocent or guilty of manslaughter, guilty of murder in the second degree, guilty of murder in the first degree with recommendation of a life sentence, or guilty of murder in the first degree without recommendation.[2] The defendant said that he understood the mandatory penalty for the crime to which he was pleading. He said that his parents had talked to him about his guilty plea, and that he was "very much" satisfied with the manner in which his attorneys had represented him. The defendant acknowledged that he was not confused by any of the questions asked of him by the judge. The judge accepted the defendant's plea and sentenced him, as the statute requires, to life imprisonment. G. L. c. 265, § 2, as amended by St. 1979, c. 488, § 2.

2. *The motion for a new trial.* In an affidavit filed in support of his motion for a new trial, the defendant stated that, after he and the victim left the Kenmore Club, they proceeded to the Esplanade. There, they kissed; he asked her to take him to her room; she refused. The defendant told the victim that she was a "tease." Thereafter, according to the defendant, "some heated words followed between us and an altercation developed as a result of which I slapped her face and her head bumped on the rear of the cement upriser that was attached to the bench we were sitting on." The defendant immediately fled, and was later arrested.

The defendant alleged that his attorneys had never informed him of the elements of the crimes of murder in the second degree or of manslaughter. He asserted that, if he had been so informed, he would have insisted on going forward with the trial on a theory of manslaughter. The defendant now claims that, during the incident, he was laboring under the heat of passion, that he lacked the requisite intent for the crime of murder (either in the first or second

---

[2] At the time of the defendant's trial, a jury was permitted to find an accused guilty of murder in the first degree, but to recommend that life imprisonment be imposed, rather than the death penalty, which was otherwise mandatory for a first degree murder conviction. See G. L. c. 265, § 2, as amended through St. 1956, c. 731, § 12.

degree) and that the crime he admitted to having committed was, at most, manslaughter. In summary, the defendant based his motion for a new trial on the assertion that his plea of guilty to the charge of murder in the second degree was not knowingly, intelligently and voluntarily made because he had never been informed, and was not aware, of the elements of the crime to which he offered to plead.

The motion judge made specific findings of fact, as required by Mass. R. Crim. P. 30 (b), 378 Mass. 900 (1979). Among those findings are the following.

At all times, the defendant's trial counsel acted and performed in a competent and effective manner. Specifically, counsel discussed with the defendant and his family, before trial, all of the possible crimes of which the defendant might be convicted on the basis of the evidence available to the Commonwealth, and the elements of those crimes.

Before trial, the defendant's counsel reached a reasonable professional conclusion, based on the evidence, that the likelihood of a manslaughter conviction was poor, and the risk of a first degree murder conviction was significant.

As the Commonwealth presented its case at trial, this reasonable professional conclusion was reinforced. Trial counsel reasonably concluded that (a) the chance of receiving a manslaughter instruction, much less a jury verdict of manslaughter, was remote to the point of virtual futility, and (b) the chance of receiving a conviction of murder in the first degree remained significant.

Trial counsel did not review with the defendant, either during trial or during the discussions which culminated in the defendant's change of plea, the differing elements of the lesser included offenses to murder in the first degree. "Based on the focused attention . . . of counsel [during trial] upon first and second degree, to the practical exclusion of manslaughter as a viable option, the attention of the defendant and his family were [sic] similarly focused. Accordingly, the effect and impact of any prior explanation to the defendant of the distinctions between manslaughter and second degree *had become ineffective*" (emphasis supplied).

As a result, at the time the defendant entered his plea of guilty to the charge of murder in the second degree, "he was unaware (or lacked an effective and appropriate understanding) of the elements of proof and factual conduct which distinguish manslaughter from second-degree." When the defendant responded in the negative to the trial judge's question whether he had acted "as a result of passion," the defendant misunderstood the legal meaning of the term. By responding negatively to that question, the defendant intended only to deny that the incident was in any way a sexual assault.

After finding the facts summarized above, the motion judge reached the following conclusion of law: "[B]ased on the fact-finding that the defendant was unaware of the legal distinction, in terms of elements of factual proof (specifically, the intent to harm), between second degree and manslaughter; and based upon the lack of evidence, either within the plea transcript or external thereto, establishing a specific or implicit adoption by the defendant of a description of conduct which established an intent to harm; I am compelled as a matter of law to find that the plea was not intelligent, that the defendant lacked a legally sufficient understanding of the charge to which he plead[ed], that the plea is thus involuntary, and that therefore it must be vacated."

3. *Voluntariness of the defendant's plea.* Rule 30 (b) of the Massachusetts Rules of Criminal Procedure, 378 Mass. 900 (1979), allows a judge to grant a new trial "at any time if it appears that justice may not have been done."[3] If, however, the original criminal proceeding was infected with prejudicial constitutional error, the motion judge has no discretion to deny a motion for a new trial. *Commonwealth* v. *Penrose,* 363 Mass. 677, 681 (1973). *Earl* v. *Commonwealth,* 356 Mass. 181, 184 (1969).

In this case, the motion judge made findings of fact, pursuant to rule 30 (b), which he thought compelled him as a

---

[3] The statutory predecessor to Mass. R. Crim. P. 30 (b) contained similar language. See G. L. c. 278, § 29, repealed by St. 1979, c. 344, § 46; *Commonwealth* v. *Stout,* 356 Mass. 237, 242 (1969).

matter of law to find that the defendant's plea was involuntary. His grant of the defendant's motion for a new trial was grounded, impliedly, in the judge's belief that prejudicial constitutional error had occurred, and that therefore he had no discretion to deny the defendant's motion. Since we conclude that no prejudicial constitutional error occurred, we reverse and reinstate the original judgment of conviction.

If a defendant is unaware of the essential elements of the crime to which he is pleading, and does not admit to facts sufficient to establish the existence of those elements, prejudicial constitutional error has occurred; the defendant has not made a knowing, intelligent and voluntary plea and his conviction, based upon that plea, must be set aside. *Henderson* v. *Morgan*, 426 U.S. 637, 651 (1976) (White, J., concurring).

a. *Awareness of nature of crime.* The defendant based his claim of prejudicial constitutional error on the assertion that he was not informed, at any time, of the elements of the crime of second degree murder, and that therefore his plea of guilty of that offense was not knowing or intelligent. The motion judge did not credit the defendant's factual allegation. The judge found that the defendant's competent and effective trial attorneys discussed with the defendant and his family, before trial, "all options [with regard to the crimes of which the defendant might be convicted] and their distinctive elements."

The motion judge did not find specifically that, at the time the defendant changed his plea, the defendant was unaware that malice (or, loosely, intent)[4] was an essential element of the crime of murder in the second degree. It is the presence of malice, however, that primarily distinguishes manslaughter from murder, and the motion judge did find that the defendant was unaware, at the time he changed his plea, of the "elements of factual proof (specifically, the intent to harm)" which distinguish manslaughter from murder in the second degree. This finding strongly implies, at least, the further finding that the defendant lacked an

---

[4]See *Richard* v. *Commonwealth*, 382 Mass. 300, 307 (1981).

understanding of an essential element of the crime to which he pleaded guilty. In light of the explicit finding that the essential elements of the crime of second degree murder were discussed with the defendant before trial, and in light of the special circumstances of this case, the implied finding that the defendant lacked an understanding of an essential element of the crime to which he pleaded is in error. Prejudicial constitutional error did not occur.

The motion judge's finding establishes that, before trial, the defendant did have "real notice of the true nature of the charge against him," *Henderson* v. *Morgan, supra* at 645, quoting from *Smith* v. *O'Grady,* 312 U.S. 329, 334 (1941), and of the true nature of the lesser included offense to which he pleaded guilty. No one has argued that the defendant is not an intelligent man; indeed, there is strong evidence that he is of above-average intelligence.[5] Compare *Henderson* v. *Morgan, supra* at 642 n.9 (defendant's "functioning I. Q." between 68 and 72).

The motion judge made only two findings in support of his conclusion that the explanations of the essential elements of first degree murder and lesser included offenses, made by the defendant's attorneys to the defendant before trial, had "become ineffective" by the time the defendant changed his plea. The first is that the defendant's attorneys' "focused attention," during trial, was on the likelihood of a first degree conviction, and that the possibility of a manslaughter verdict was excluded as a viable option by trial counsel. The judge also found that the trial counsel reached a reasonable

---

[5] The judge who presided at trial and accepted the defendant's plea filed an affidavit and accompanying letter in which he stated that, to the best of his knowledge and recollection, he had "inquired very carefully into the voluntariness of the [defendant's] plea and [the defendant's] understanding of the consequences and the punishment." The trial judge concluded that the defendant "was a very intelligent young man and thoroughly understood what he was doing." In addition, one of the defendant's two trial attorneys testified that the defendant was "very intelligent" and that, based on his discussions with the defendant concerning the elements of the crimes of which the defendant might be convicted, he believed that the defendant understood those elements.

professional conclusion, as the evidence came in, that "(a) the chance of receiving a manslaughter instruction, much less a jury verdict therefor, was remote to the point of virtual futility; and (b), the chance of receiving a first-degree conviction was significant." These findings do not support the conclusion that the "real notice of the true nature" of the crime of murder in the second degree, given to the defendant before trial, "had become ineffective" after two and one-half days of trial testimony.

The second finding which the motion judge viewed as supporting his conclusion is that "[a]t the time immediately preceding and during trial, the defendant was under significant emotional stress, and dependent upon the advice of his family as well as his trial attorney." It cannot be denied that defendants on trial for murder are usually "under significant emotional stress" and dependent on the advice of their trial counsel and others. Were this fact alone sufficient to support the grant of a new trial for defendants who plead guilty, trial courts of the Commonwealth doubtless would be inundated by motions for new trials. We hold that where an intelligent defendant has been properly represented by competent and effective trial counsel, who have explained fully the elements of the crimes of which the defendant might be convicted on the evidence, a finding that the defendant was under significant emotional stress immediately preceding and during trial, and at the time he changed his plea, is not legally sufficient to support a motion judge's conclusion that prejudicial constitutional error has occurred.

b. *Adoption of description of conduct establishing intent to harm.* The requirements of *Henderson* v. *Morgan, supra,* could be met in this case if the defendant admitted facts constituting the element of intent. See *Commonwealth* v. *Huot,* 380 Mass. 403, 409 (1980); *Osborne* v. *Commonwealth,* 378 Mass. 104, 108 (1979). The judge concluded that he was compelled as a matter of law to find that the defendant's plea was not intelligent because of "the lack of evidence, either within the plea transcript or external thereto, establishing

a specific or implicit adoption by the defendant of a description of conduct which established an intent to harm." This statement may be read to mean that the evidence would not support a conclusion that the defendant adopted a description of his conduct which established an intent to harm. If so, the statement is contradicted by the record. The record does contain evidence on the basis of which a trier of fact reasonably could conclude that the defendant adopted such a description.[6]

In any event, if a defendant is aware at the time he pleads guilty that malice is an element of the crime to which he is pleading, it is immaterial that he does not admit to that element. "A guilty plea . . . is not 'compelled and invalid under the Fifth Amendment whenever motivated by the defendant's desire to accept the certainty or probability of a lesser penalty rather than face a wider range of possibilities . . . .'" *Commonwealth* v. *Morrow*, 363 Mass. 601, 606 (1973), quoting from *Brady* v. *United States*, 397 U.S. 742, 751 (1970). "[W]here 'a defendant *intelligently* concludes that his interests require entry of a guilty plea and the record before the judge contains strong evidence of actual guilt' a plea may be accepted even if accompanied by protestations

---

[6] During the plea hearing, the following colloquy occurred between the defendant and the trial judge:

THE JUDGE: "You lawfully pleaded to second degree. Have you heard the facts produced by the Commonwealth as to the manner in which this homicide took place?"

THE DEFENDANT: "Yes."

THE JUDGE: "Did you in fact unlawfully kill this young lady?"

THE DEFENDANT: "Yes, sir."

THE JUDGE: "So you are in fact guilty?"

THE DEFENDANT: "Yes, sir."

Under Massachusetts law, "neither an underlying felony nor any intentional killing is required for a conviction of second degree murder. All that must be proven is malice aforethought, which includes 'any unexcused intent . . . to do an act creating a plain and strong likelihood that death or grievous harm will follow.'" *Richard* v. *Commonwealth, supra,* quoting from *Commonwealth* v. *Huot,* 380 Mass. 403, 408 (1980). The record contains no evidence which would raise the issue of a legally valid excuse, or of a possible mitigation of the defendant's offense from murder to manslaughter. See *Commonwealth* v. *Soaris,* 275 Mass. 291, 299 (1931).

of innocence" (emphasis supplied by White, J.). *Henderson* v. *Morgan, supra* at 648-649 n.1 (White J., concurring), quoting from *North Carolina* v. *Alford,* 400 U.S. 25, 37 (1970).

Of course, as this court has noted, "it is desirable that a factual basis for the guilty plea be shown, by specific admissions of the defendant or other factual presentation made before the plea is accepted by the judge." *Commonwealth* v. *Morrow, supra* at 607-608. An adequate factual basis for a guilty plea is especially important where, as here, the defendant does not clearly admit to all the elements of the crime to which he offers to plead. Strong evidence of the defendant's guilt with respect to a more serious charge increases the likelihood that the defendant's decision to plead guilty to a lesser charge was intelligently made. Cf. *North Carolina* v. *Alford, supra* at 37-38. In the instant case the evidence presented by the Commonwealth at trial provided a sufficient factual basis for a conviction on the charge of murder in the first degree.[7]

The defendant has argued that *Henderson* v. *Morgan,* 426 U.S. 637 (1976), must be given retroactive effect and applied to his case and that, under the rule announced in *Henderson,* his plea must be found involuntary.[8] We need

---

[7] The prosecutor, in his opening statement at trial, stated that he would prove that the victim's murder was committed "with extreme atrocity and cruelty." The prosecutor also suggested the possibility that the victim's death occurred during the commission of a sexual offense or a robbery. While the evidence introduced at trial might not have been sufficient to support a jury verdict of guilty of first degree murder on a felony-murder theory, that evidence certainly would have supported such a verdict on the basis that the defendant acted with extreme atrocity or cruelty. See G. L. c. 265, § 1; *Commonwealth* v. *Eisen,* 358 Mass. 740, 746-747 (1971), and cases cited. The defendant's attorneys stipulated before trial that the defendant was competent to stand trial, and that he would raise neither an alibi nor an insanity defense.

[8] Many judges of the trial courts of the Commonwealth, when presiding at plea hearings, routinely ensure that defendants are aware of the elements of the crimes to which they are offering to plead by having the defendant's attorney explain to the defendant, on the record (although not necessarily in the presence of the judge), the essential elements of both the

not decide whether that rule should be applied retroactively. The defendant received "real notice of the true nature" of the charge to which he pleaded guilty, as required by *Henderson.* See *Commonwealth* v. *Swift,* 382 Mass. 78 (1980); *Commonwealth* v. *Huot,* 380 Mass. 403 (1980); *Osborne* v. *Commonwealth,* 378 Mass. 104 (1979); *Commonwealth* v. *Soffen,* 377 Mass. 433 (1979); *Commonwealth* v. *McGuirk,* 376 Mass. 338 (1978), cert. denied, 439 U.S. 1120 (1979), in which we reached the same conclusion.

The order granting the defendant's motion for a new trial is reversed and the original judgment of conviction is reinstated.

*So ordered.*

crime with which the defendant is charged and that to which he is offering to plead. We encourage this practice; it provides greater assurance that a defendant's guilty plea is knowingly, intelligently and voluntarily made, and also reduces ambiguities in the trial or plea hearing record which might otherwise lead to applications for postconviction relief. See *Roddy* v. *Black,* 516 F.2d 1380, 1384 (6th Cir.), cert. denied, 423 U.S. 917 (1975).