COMMONWEALTH *vs.* DAVID M. AZAR.

No. 99-P-223.

Middlesex. June 6, 2000. - January 31, 2001.

Present: JACOBS, BECK, & DUFFLY, JJ.

Further appellate review granted. 434 Mass. 1103 (2001).

*Homicide. Malice. Practice, Criminal,* Capital case, New trial, Instructions to jury.

Discussion of cases considering jury instructions on the third prong of malice. [769-770, 775-776]
In a murder case, a substantial risk of a miscarriage of justice arose from the judge's erroneous jury instruction on the third prong of malice, and the defendant was entitled to a new trial. [770-772, 776-778]

INDICTMENT found and returned in the Superior Court Department on December 15, 1988.

Following review by this court, 32 Mass. App. Ct. 290 (1992), a motion for a new trial, filed on November 24, 1998, was considered by *Hiller B. Zobel,* J.

*Richard J. Fallon* for the defendant.

*Kimberly Peterson,* Assistant District Attorney, for the Commonwealth.

BECK, J. On July 28, 1989, the defendant was convicted of the second degree murder of his four month old daughter on an indictment comprehending murder in the first degree. More than six years after we affirmed his conviction in *Commonwealth* v. *Azar,* 32 Mass. App. Ct. 290 (1992), the defendant filed a pro se motion for a new trial or, "[i]n the alternative, . . . for the entry of a finding of guilty to the lesser included offense of manslaughter." The defendant claimed he was entitled to relief on the grounds that the trial judge's instructions on third prong malice were erroneous and that his trial counsel was ineffective for failing to object to the erroneous instructions. The judge refused to act on the defendant's motion, ruling that

"[the] Defendant could have raised this issue in his

original appeal, or in his application for further appellate review. I do not believe it is in the interests of justice to re-open the appellate agenda. Nor do I believe a lesser verdict is more consonant with the interests of justice. Motion, therefore, not acted on."

The defendant appeals from this disposition of his motion.

Review of a judge's ruling on a motion for new trial is limited to determining whether the judge abused his discretion, particularly where, as here, the trial judge is the one ruling on the motion. See *Commonwealth* v. *Moore*, 408 Mass. 117, 125 (1990). However, a judge has no discretion to deny a motion for a new trial if the original criminal proceeding was infected with prejudicial constitutional error. *Commonwealth* v. *Sullivan*, 385 Mass. 497, 503 (1982). In order to determine whether the judge abused his discretion, we must determine first whether the instructions were erroneous. If they were, we next consider whether the defendant waived his right to complain of the error. Finally, if we find waiver, we must determine whether the error "was of a type and seriousness which should lead [us] to reverse in the absence of a proper exception," under the familiar substantial risk of a miscarriage of justice standard. See *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. 10, 16 (1986), quoting from *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967).

*The malice instructions.* At the end of the trial, the judge instructed the jury as follows:

> "To prove malice, the government must prove beyond a reasonable doubt one of three things: either, that [the defendant] acted intending to kill [his daughter]; or, that he acted intending to cause her grievous, that is serious, bodily harm; or, that he intended to do an act creating a strong and plain likelihood, in light of normal human experience, that death *or grievous, that is, serious, bodily harm would result* to [his daughter]" (emphasis added).

The judge gave the essence of these instructions three times — first, in his preliminary instructions to the jury pool; next, in preliminary instructions to the empaneled jury; and finally, in the words set out above in his instructions to the jury at the conclusion of the trial. There was no objection.

There is no dispute that the underlined portion of the instruc-

tion on the third alternative definition of malice, often referred
to as third prong malice, was incorrect. "[T]he third prong of
the malice definition can only be satisfied by proof that 'there
was a plain and strong likelihood of death.' " *Commonwealth* v.
*Vizcarrondo*, 427 Mass. 392, 396 n.5 (1998), quoting from
*Commonwealth* v. *Fuller*, 421 Mass. 400, 412 (1995), quoting
from *Commonwealth* v. *Sires*, 413 Mass. 292, 303 n.14 (1992).
Intending to do an act creating a strong likelihood of grievous
bodily harm does not constitute malice. *Commonwealth* v. *Viz-
carrondo*, 427 Mass. at 396. "Without malice, an unlawful kill-
ing can be no more than manslaughter." *Ibid.*, quoting from
*Commonwealth* v. *Judge*, 420 Mass. 433, 437 (1995). "A
conviction of murder founded on a state of mind sufficient only
to support a manslaughter conviction violates due process."
*Commonwealth* v. *Vizcarrondo, supra* at 396-397.

In asserting that he did not waive his right to claim error in
the malice instructions, the defendant makes several arguments,
citing *Commonwealth* v. *Lanoue*, 409 Mass. 1, 2-4 (1990) (claim
of ineffective assistance of counsel when counsel on direct ap-
peal was trial counsel), and *Commonwealth* v. *Miranda*, 22
Mass. App. Ct. at 16 (substantial risk of a miscarriage of justice;
clairvoyance). The Commonwealth argues that the defendant's
delay in filing his motion constituted waiver, quoting from
*Commonwealth* v. *Curtis*, 417 Mass. 619, 623 (1994), concern-
ing potential prejudice to the Commonwealth resulting from
delay (without alleging any facts suggesting prejudice in this
case), and distinguishing *Commonwealth* v. *Lanoue, supra*.

We review the error at issue here in light of these arguments.
As the defendant points out in persuasive detail, the erroneous
language had appeared in a number of appellate cases in the
period before, during, and even after his trial and direct appeal.
(The correct instruction dates back at least to *Commonwealth* v.
*Chance*, 174 Mass. 245, 252 [1899] [Holmes, C.J.]. See *Com-
monwealth* v. *DiRenzo*, 44 Mass. App. Ct. 95, 99-100 [1997].)
The defendant identifies *Commonwealth* v. *Huot*, 380 Mass.
403, 408 (1980) (attempt to withdraw a guilty plea), as the
debut appearance of the defective definition of malice. The
Supreme Judicial Court later acknowledged, "On occasion . . .
when the definition of the third prong of malice [was] not . . .
directly at issue, [the court] included the grievous bodily harm
language in [its] statement of the definition [of third prong
malice]. . . . On other occasions, in cases challenging jury

instructions on other grounds, [the court] did not correct instructions that included the grievous bodily harm language." *Commonwealth* v. *Vizcarrondo*, 427 Mass. at 396 n.5 (citations omitted).

In 1992, in a footnote in *Commonwealth* v. *Sires*, 413 Mass. at 303 n.14, the court "reject[ed] any suggestion that . . . something less than a plain and strong likelihood of death [is] sufficient for proof of the third prong of malice." See *Commonwealth* v. *Fuller*, 421 Mass. at 412. *Commonwealth* v. *Sires*, *supra*, was decided four months after we issued our opinion in the defendant's direct appeal. *Commonwealth* v. *Azar*, *supra*. *Sires*'s acknowledgment of the dissemination of the defective definition did not constitute a new rule of law, however, because, as the defendant points out, simultaneously with repetition of the erroneous language in some appellate decisions, see, e.g., *Richard* v. *Commonwealth*, 382 Mass. 300, 307 (1981); *Commonwealth* v. *Estremera*, 383 Mass. 382, 395 (1981); *Commonwealth* v. *Moran*, 387 Mass. 644, 648 (1982); *Commonwealth* v. *Quigley*, 391 Mass. 461, 466 (1984), cert. denied, 471 U.S. 1115 (1985); *Commonwealth* v. *Puleio*, 394 Mass. 101, 108 (1985); *Commonwealth* v. *Boucher*, 403 Mass. 659, 662 n.2 (1989); *Commonwealth* v. *Halbert*, 410 Mass. 534, 536 n.3 (1991); *Commonwealth* v. *Sullivan*, 29 Mass. App. Ct. 93, 95 (1990), all citing *Commonwealth* v. *Huot*, *supra*; *Commonwealth* v. *Delaney*, 418 Mass. 658, 666 (1994); *Commonwealth* v. *Pierce*, 419 Mass. 28, 37 (1994); *Commonwealth* v. *Estep*, 38 Mass. App. Ct. 502, 507-508 (1995), there were also statements of the correct instruction, most notably the oft-cited *Commonwealth* v. *Grey*, 399 Mass. 469, 470 n.1 (1987). See, e.g., *Commonwealth* v. *Starling*, 382 Mass. 423, 426 (1981); *Commonwealth* v. *Hutchinson*, 395 Mass. 568, 579 (1985). See generally *Avellar* v. *DuBois*, 30 F. Supp. 2d 76, 94-97 (D. Mass. 1998), for review of inconsistent treatment of third prong malice instructions.

*Standard of review.* The defendant's delay in bringing a motion for new trial does not in itself constitute waiver. See *Commonwealth* v. *Francis*, 411 Mass. 579, 585-586 (1992). However, notwithstanding the fact that the highest court of the Commonwealth was repeating an incorrect definition of malice, even if only in cases where the jury instructions were not at issue, this is not a case in which the failure to object is excused because a constitutional principle was not sufficiently developed.

See *Commonwealth* v. *Bowler,* 407 Mass. 304, 307 (1990), and cases cited; *Commonwealth* v. *Miranda,* 22 Mass. App. Ct. at 16 ("clairvoyance" exception). Therefore, there having been no objection to the erroneous instructions, the cases are clear that we review the record to determine whether the error created a substantial risk of a miscarriage of justice. Compare *Commonwealth* v. *Williams,* 428 Mass. 383, 385 (1998) (substantial likelihood of a miscarriage of justice). "An error creates a substantial risk of a miscarriage of justice unless we are persuaded that it did not 'materially influence[]' the guilty verdict. *Commonwealth* v. *Freeman,* [352 Mass.] at 564. In making that determination, we consider the strength of the Commonwealth's case against the defendant (without consideration of any evidence erroneously admitted), the nature of the error, whether the error is 'sufficiently significant in the context of the trial to make plausible an inference that the [jury's] result might have been otherwise but for the error,' *Commonwealth* v. *Miranda,* 22 Mass. App. Ct. [at] 21 . . . , and whether it can be inferred 'from the record that counsel's failure to object was not simply a reasonable tactical decision.' *Id.*" *Commonwealth* v. *Alphas,* 430 Mass. 8, 13 (1999) (footnote omitted).

Despite some confusion in recent third prong malice cases, compare *Commonwealth* v. *Vizcarrondo,* 427 Mass. at 393 (setting forth the facts in the light most favorable to the Commonwealth), with *Commonwealth* v. *Williams,* 428 Mass. at 388 ("tak[ing] the view of the evidence most favorable to the defendant"), we conclude that, in analyzing this case, we should consider all of the properly introduced evidence. See, e.g., *Commonwealth* v. *DiRenzo,* 44 Mass. App. Ct. at 100 (considering conflicting evidence); *Commonwealth* v. *Pichardo,* 45 Mass. App. Ct. 296, 300-301 (1998) (viewing evidence from two points of view).

In examining the facts that were before the jury, we are mindful that we have already determined there was sufficient evidence to support the defendant's conviction for second degree murder. *Commonwealth* v. *Azar,* 32 Mass. App. Ct. at 305. Indeed, "there was ample evidence to support the judge's submission to the jury on first degree murder by means of extreme atrocity or cruelty." *Id.* at 305 n.3. Nevertheless, what we must consider now is whether, in view of all the evidence before them, the jury could have found the defendant guilty of second degree murder based on the erroneous instructions. In

other words, could the jury have convicted the defendant of second degree murder on the basis, as the judge said, that the defendant "intended to do an act creating a strong and plain likelihood, in light of normal human experience, that . . . grievous, that is, serious, bodily harm would result to [his daughter]."

*Facts.* The jury heard the testimony of twenty witnesses, ten for the Commonwealth and ten for the defendant. The Commonwealth's witnesses included the defendant's wife, father-in-law, and sister-in-law; the Sudbury fire chief and a fire fighter; two Sudbury police officers and a State trooper; and two medical experts. The defendant testified on his own behalf. His other witnesses included two friends who visited him on occasions when he was taking care of his children, his sister, his original lawyer, an investigator, a business acquaintance, and two medical experts. The Commonwealth's evidence is summarized in our decision on the defendant's direct appeal, 32 Mass. App. Ct. at 291-292, as well as in other places throughout that opinion. The issues in that case included the sufficiency of the evidence, in which we viewed the evidence in the light most favorable to the Commonwealth. For the purpose of reviewing the possible impact of the erroneous instructions on the jury's verdict, a broader review of the evidence introduced at trial follows.

On Sunday, November 27, 1988, the defendant was at home in Sudbury with his three children — the victim and her twin brother, who were four months old, and their older brother, who was not yet two. The defendant's wife was working at the family's store in Cambridge. Following the second of two telephone calls from the wife, her parents and sister drove to the Azars' house around noon. They found the baby lying motionless and gray on her stomach in her crib. She had no pulse and was not breathing. There was a bruise under her chin that had not been there earlier in the day. The sister called the Sudbury police, who instructed her over the telephone how to perform cardiopulmonary resuscitation (CPR). The defendant stood by and twice said, "Oh my God, I killed my baby." The police and emergency assistance arrived and continued the CPR as they drove the baby to the hospital. The defendant did not accompany his daughter to the hospital. He stayed home with his sons.

The baby did not respond to the attempts to resuscitate her, and was pronounced dead shortly after arriving at the hospital.

Commonwealth v. Azar.

The doctor who delivered the news of her death told the family he thought the baby died from sudden infant death syndrome. However, a subsequent autopsy revealed a very different cause of death. Doctor Joanne Richmond, an associate chief medical examiner in the Commonwealth, conducted the autopsy. At the time of her testimony, she had conducted sixteen to twenty autopsies of small children, six of which involved victims of homicide with skull fractures. *Commonwealth* v. *Azar*, 32 Mass. App. Ct. at 301. Qualified as an expert in forensic pathology, she testified to the following observations.

The baby had a number of very recent bruises on her face, chest, back, and buttocks, as well as her left ankle. The baby also had a c-shaped fracture four inches long on the right skull bone. There was massive bruising and hemorrhaging covering an area five by six inches on the right side of her head, which was filled with a one-quarter inch layer of blood. The baby's brain was moderately swollen and flattened, the result of severe injury to the head. There was no injury to the brain other than swelling. The injuries were consistent with the baby having been held tightly by the ankles and forcefully swung so that the right side of her head struck a large flat object, such as a wall or headboard. *Id.* at 301-302. A pediatric radiologist who also testified for the Commonwealth observed the fractured skull but no damage to the brain itself.

There were other older injuries to the baby as well, including multiple fractures of her legs and her ribs. A pediatric radiologist testified for the Commonwealth that the baby's injuries were consistent with battered child or "shaken baby" syndrome. The defendant said he had "a personality problem" with the baby, that she did not like him. He told his father-in-law that "boys are the way to go and girls are trouble."

After the baby's death, the defendant told the Sudbury fire chief and a Sudbury police officer that, when he checked on the baby during the morning, she did not seem to be breathing. He said he picked her up and blew on her a few times and then brought her down to the kitchen and called his wife at work. He told his wife the baby was having trouble breathing but he put her back in her crib and she seemed to be doing all right.

At trial, the defendant testified that the baby's injuries were an accident that occurred when he was racing to the telephone to call his wife about the baby's breathing problems and the baby fell out of his arms onto the kitchen counter when he

reached for the phone. He had a variety of explanations for previous bruises his wife and other witnesses had noticed over the two months preceding the baby's death. The defendant also said that the baby bruised easily and cried a lot. The defendant acknowledged to police that because of his size he might have held her too tightly. (The defendant was five feet ten inches tall and weighed 210 pounds.) Family members said they had seen the defendant holding the baby too tightly. The defendant also suggested that the baby may have "banged her head" on the sink when he was bathing her.

The defendant's evidence included the testimony of two forensic experts, both of whom had interviewed the defendant. The pathologist, the chief medical examiner for Rhode Island and a professor of pathology, had conducted 1,000 autopsies on children under the age of two and one-half, including two hundred involving skull fractures. He had also published articles about pediatric pathology. He testified that moderate trauma caused the baby's skull fracture. There was no underlying injury to the brain tissue. In his opinion, the injuries were consistent with the defendant's testimony that the baby was propelled from his shoulder onto the kitchen counter.

A second forensic pathologist, a former chief medical examiner for New York City, had performed thousands of autopsies, including 1,000 on battered children. He testified that, although "the child suffered multiple injuries over a period of time," there was insufficient evidence that the injuries were intentionally inflicted. There was no injury to the baby's brain and only slight swelling of the brain. Over the years, he had experience with at least a dozen cases in which children had been swung by the ankles against a blunt surface. In his opinion, the injuries to the baby in this case were not consistent with such treatment because of the absence of brain damage. Nor did he find evidence of hemorrhaging around the brain or the eyes consistent with shaken baby syndrome. Indeed, he thought the cause of death was not evident from the autopsy. In his opinion, the leg fractures, which Dr. Richmond thought resulted from grabbing the baby by the ankles, actually occurred during the autopsy and were not incurred before death.

The Commonwealth's primary theory of the case was based on Dr. Richmond's opinion that the cause of the baby's death was blunt trauma to the head and brain. She believed that the defendant held his daughter tightly around the legs above the

ankles and swung her body with force so that the right side of her head hit a hard flat surface. In her closing argument, the prosecutor relied on the same erroneous definition of third prong malice to which the jury had already been introduced in the judge's preliminary instructions. She argued to the jury that

> "[the baby] died because this defendant did an act, caused that blow to her head [a]nd that . . . act . . . created a plain and strong likelihood that serious grievous bodily injury or death would occur. . . . [Y]ou can forget about the defense attorney telling you you have to find he intended to kill or murder; you don't. You just have to find that he did the act, that he struck the blow, that he caused the injury to her head [a]nd that's murder."

*Discussion.* On appeal, the Commonwealth devotes thirty-two pages of its brief to the facts. It then argues that the erroneous instructions did not create a substantial risk of a miscarriage of justice because there was overwhelming evidence to support the conclusion that a reasonable person in the defendant's position would have known there was a plain and strong likelihood of death. However, the appellate cases the Commonwealth cites in support of this argument involved the use of a weapon in an inherently deadly manner. See *Commonwealth* v. *Morgan*, 422 Mass. 373, 382 (1996) (defendant stabbed victim in abdomen); *Commonwealth* v. *Fryar*, 425 Mass. 237, 248, cert. denied, 522 U.S. 1033 (1997) (defendant stabbed victim in the chest). See also *Commonwealth* v. *Freeman*, 430 Mass. 111, 123 (1999) (victim repeatedly and violently stabbed at least twenty-three times in head, neck, and chest); *Commonwealth* v. *Solomonsen*, *ante* 122, 125 (2000) (shooting at close range).

The defendant argues that the case is governed by *Commonwealth* v. *Vizcarrondo*, 427 Mass. 392 (1998), the first case in which the Supreme Judicial Court reversed a murder conviction (in that case first degree murder) because of error in third prong malice instructions. (This court had come to a similar conclusion five months earlier in *Commonwealth* v. *DiRenzo*, 44 Mass. App. Ct. 95 [1997].) Not only is *Vizcarrondo* an important case in third prong malice litigation, its facts are in many ways close to the facts in the matter before us. We therefore review *Vizcarrondo* in some detail.

The victim in *Vizcarrondo* was a ten month old baby. The evidence showed that the child suffered extensive bruising, hu-

man bite marks in several places on her body, multiple fresh rib fractures and a fresh leg fracture, internal bleeding, and a lacerated and crushed liver. 427 Mass. at 393. As in this case, the defendant gave several different accounts as to how the baby came to have those injuries. First he said the baby fell off the bed onto the floor. *Id.* at 394. After he was arrested, he admitted that he squeezed the baby, but not hard enough to kill her, and that he bit her arms twice. *Ibid.* When a police officer told the defendant his account was not consistent with the baby's injuries, the defendant changed his story again. He said that the baby fell off the bed and, when he reached over to pick her up, he tripped over a pile of clothes, and the two of them fell. He suggested that the baby must have hit her stomach against the wooden edge of the bed. When the arresting officer said this account was also inconsistent with the baby's injuries, the defendant said that, as he attempted to lift the baby from the floor, he tripped over the bed, and his elbow landed on her stomach when he fell. *Ibid.*

The Supreme Judicial Court held that the erroneous third prong malice instructions on these facts "permitted the jurors to infer malice solely from conduct that 'involves a high degree of likelihood that substantial harm will result to another.' " *Id.* at 397, quoting from *Commonwealth* v. *Sires*, 413 Mass. 292, 303-304 n.14 (1992). "[T]he evidence could have 'warrant[ed] a finding of risk of harm less than a strong likelihood of death.' " *Commonwealth* v. *Vizcarrondo*, 427 Mass. at 397, quoting from *Commonwealth* v. *Murphy*, 426 Mass. 395, 401 (1998), quoting from *Commonwealth* v. *Fryar*, 425 Mass. at 248. "Although the injuries to the baby were severe and ultimately fatal, the injuries were not inflicted in a manner from which malice is ineluctably inferred." *Commonwealth* v. *Vizcarrondo*, 427 Mass. at 397, contrasting previous cases involving an inherently deadly attack where the court had rejected similar challenges, such as *Commonwealth* v. *Mello*, 420 Mass. 375, 390 (1995) (defendant firebombed an occupied apartment building at night); *Commonwealth* v. *Fryar*, 425 Mass. at 248 (victim stabbed in the chest); and *Commonwealth* v. *Murphy*, 426 Mass. at 401 (same).

There appear to us to be two possible distinctions between *Vizcarrondo* and the case before us. First, in contrast to *Vizcarrondo*, here it was a head injury that caused the baby's death rather than an injury to her internal organs. Second, here there was considerably more evidence of injuries to the baby in the

month preceding her death. On the other hand, the bite marks in *Vizcarrondo* suggest a kind of malicious intent less clearly present in this case. Moreover, even the prosecutor acknowledged in her closing argument in the case before us that "we don't know exactly how it happened." To be sure, "a slight blow on the head of a new-born infant, which, if inflicted on an adult, would be harmless, . . . is proof upon which a jury might well find a party guilty of murder." *Commonwealth* v. *Fox*, 7 Gray 585, 588 (1856). See *Commonwealth* v. *Cadwell*, 374 Mass. 308, 316-318 (1978); *Commonwealth* v. *Starling*, 382 Mass. at 426; *Commonwealth* v. *Fratus*, 385 Mass. 551, 554 (1982); *Commonwealth* v. *Hutchinson*, 395 Mass. at 579. But as presently before us, this case is not about the sufficiency of the evidence. And as we have indicated, the cases in which errors in third prong malice instructions have been deemed not prejudicial involved the use of inherently deadly weapons. See discussion, *supra* at 775.

After consideration of relevant precedent, we conclude that the case at bar is closer to the four cases in which we or the Supreme Judicial Court have found reversible error in third prong malice instructions, than to the cases on which the Commonwealth relies. See, in addition to *Vizcarrondo, supra, Commonwealth* v. *Williams*, 428 Mass. at 385, 388 (reversing first degree murder conviction where victim died of crushed throat after beating, but there was conflicting evidence about length of attack, use of shod foot, condition of victim, and defendant claimed an asthma attack); *Commonwealth* v. *DiRenzo*, 44 Mass. App. Ct. 95 (1997) (reversing second degree murder conviction where there was evidence defendant participated in vicious attack on victim but may have withdrawn from attack before codefendant hit the victim in the head with a baseball bat); *Commonwealth* v. *Pichardo*, 45 Mass. App. Ct. 296, 298, 300-301 (1998) (reversing second degree murder conviction on ground the jury could have believed defendant's statement that he thought the gun with which he had shot the victim in the back was "empty").

"Th[is] crime was abhorrent. But it is in just such cases that we must be on guard against too passionate a reaction, which in the long run will not promote due enforcement of the criminal law." *Commonwealth* v. *Cadwell*, 374 Mass. at 319 (Kaplan, J.). "The issue is whether the evidence *required* the jurors to find a plain and strong likelihood that death would result from the

defendant's actions, thereby rendering the erroneous instructions nonprejudicial." *Commonwealth* v. *Vizcarrondo*, 427 Mass. at 397-398. Here the Commonwealth's view of the evidence might well require such a finding. However, the jury's verdict of second degree murder suggests that they may have rejected the Commonwealth's theory, particularly if they believed the testimony of the defendant's experts. Where, as here, "the evidence permitted but did not require the jurors to conclude that there was a plain and strong likelihood that death would follow the defendant's actions, there must be a new trial." *Id.* at 398.

Given our holding under the substantial risk of a miscarriage of justice standard, we need not reach the defendant's ineffective assistance of counsel claim. See *Commonwealth* v. *Grant*, 49 Mass. App. Ct. 169, 174 n.2 (2000).

*Judgment reversed.*

*Verdict set aside.*

*Order denying motion for new trial reversed.*